UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>   v.<br><br>EDIN ISMAEL RODRIGUEZ-CARTAGENA,<br><br>   Defendant. | Case No. 22-cr-00391-WHO-1<br><br>**ORDER DENYING MOTION FOR A *FRANKS* HEARING OR TO SUPPRESS**<br><br>Re: Dkt. No. 76 |

Three defendants in this case move to suppress the fruits of two wiretaps, arguing that the affidavits the Special Agent provided to demonstrate the necessity of the wiretaps contained material and intentional or reckless misstatements or omissions concerning the efficacy of more traditional investigatory tools, fatally undermining the necessity requirement of Title III.[1] They also request an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), asserting that the Special Agent made statements amounting to deliberate falsehoods or reckless disregard for the truth regarding the past and potential use of traditional investigatory tools.

The motion is DENIED. Each of the challenged Affidavits was particularized to the conspiracy investigation at issue and contained a thorough discussion of the investigatory efforts that the government had taken within the personal knowledge of the Special Agent. Even assuming that the Special Agent made misstatements in not fully disclosing some aspects of the

---

[1] The government contests the standing of defendant Cruz-Arteaga to challenge the first wiretap because he was a target of the second wiretap only. Oppo. at 9-10. I assume, for purposes of this Order, that Cruz-Arteaga has standing as an alleged although not yet identified member of the conspiracy that the first wiretap was targeting. Separately, the government contends that Title III does not provide a statutory suppression remedy for electronic communications (*i.e.*, text messages) and, therefore, the motion could be granted for text messages only if defendants make the higher showing that one or both wiretaps lacked probable cause. *Id*. at 11-12. For purposes of this motion, I assume that electronic communications are included within the scope of Title III's statutory suppression remedy.

1  information theoretically available to him or others involved with the task force investigating these
2  and other related drug trafficking enterprises, failing to correct those potential misstatements did
3  not undermine either the necessity showing required under Title III or probable cause for the
4  wiretaps.

## BACKGROUND

Two wiretap applications and their affidavits are at issue. The first wiretap ("Wiretap 1") was based on the February 24, 2022 Affidavit of Special Agent Hakeem Oduniyi ("Affidavit 1") and signed by Honorable Vince Chhabria. Dkt. No. 78. In Wiretap 1, the government sought to intercept the wire and electronic communications of eight targets in order to gain evidence on the "Reyes Drug Trafficking Organizations ('DTO')."[2]

In the second wiretap ("Wiretap 2"), the government sought to intercept the wire and electronic communications of 18 individuals (some known and some unknown) and identified four target phones, based on the May 10, 2022 Affidavit of Special Agent Hakeem Oduniyi ("Affidavit 2"). Wiretap 2 was signed by the Honorable Edward J. Davila. Dkt. No. 78-9.

Both wiretaps were in support of investigations by a joint task force that included the "DEA, San Francisco Police Department (SFPD), and Homeland Security Investigations (HSI)." Affidavit 1, ¶ 11 ("Task Force").

## LEGAL STANDARD

### I. NECESSITY

"Title III prohibits electronic surveillance by the federal government except under carefully defined circumstances. The procedural steps provided in the Act require 'strict adherence,' . . . and "utmost scrutiny must be exercised to determine whether wiretap orders conform to Title III." *United States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001) (quoting *United States v. Kalustian*, 529 F.2d 585, 588-89 (9th Cir.1976)).

18 U.S.C. section 2518(1)(c), known as the "necessity requirement," requires that each wiretap application include "a full and complete statement as to whether or not other investigative

---

[2] Maycol Reyes-Aleman ("Reyes") was Target 1 and Hever Suarez (aka "Pizarro") was Target 2 of Wiretap 1, and their T-Mobile telephones numbers were identified in Wiretap 1.

2

1 procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if
2 tried or to be too dangerous." That requirement "'exists in order to limit the use of wiretaps,
3 which are highly intrusive.'" *United States v. Bennett*, 219 F.3d 1117, 1121 (9th Cir.2000)
4 (quoting *United States v. Commito*, 918 F.2d 95, 98 (9th Cir.1990)).

5 Therefore, "[t]he statute requires that the issuing judge determine whether the wiretap
6 application contains facts that support a finding that 'normal investigative procedures have been
7 tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too
8 dangerous.' 18 U.S.C. § 2518(3)(c). Taken together, §§ 2518(1)(c) and (3)(c) require a full and
9 complete statement establishing necessity. The purpose of these requirements is to ensure that
10 wiretapping is not resorted to in situations where traditional investigative techniques would suffice
11 to expose the crime." *Blackmon*, 273 F.3d at 1207.

12 Before approving a Title III application, "a judge must 'determine that ordinary
13 investigative techniques employing a normal amount of resources have failed to make the case
14 within a reasonable period of time.'" *Bennett*, 219 F.3d at 1122 (quoting *United States v.
15 Spagnuolo*, 549 F.2d 705, 711 (9th Cir.1977). However, the necessity requirement must be
16 interpreted and applied in "a practical and commonsense fashion." *Bennett*, 219 F.3d at 1122.
17 "[O]fficials need not exhaust every conceivable investigative technique before obtaining a
18 wiretap." *United States v. Forrester*, 616 F.3d 929, 944 (9th Cir. 2010); *see also United States v.
19 Baker*, 589 F.2d 1008, 1013 (9th Cir.1979) ("[T]he wiretap statute does not mandate the
20 indiscriminate pursuit to the bitter end of every non-electronic device as to every telephone and
21 principal in question to a point where the investigation becomes redundant or impractical or the
22 subjects may be alerted and the entire investigation aborted by unreasonable insistence upon
23 forlorn hope.").

24 Instead, the government must provide "a full and complete statement of specific
25 allegations indicating why normal investigative procedures failed or would fail in the particular
26 case. . . . Beyond the specificity requirement, we have adopted a "common sense approach" in
27 which the reviewing court uses a standard of reasonableness to evaluate the government's good
28 faith effort to use alternative investigative means or its failure to do so because of danger or low

3

probability of success." *Blackmon*, 273 F.3d at 1207 (internal citations omitted).  In the end, "[t]he necessity for the wiretap is evaluated in light of the government's need not merely to collect some evidence, but to develop an effective case against those involved in the conspiracy." *United States v. Decoud*, 456 F.3d 996, 1007 (9th Cir.2006) (internal quotation marks and citation omitted). An "effective case" means "evidence of guilt beyond a reasonable doubt, not merely evidence sufficient to secure an indictment." *United States v. McGuire*, 307 F.3d 1192, 1198 (9th Cir.2002).

      The wiretap statute also includes its own exclusionary rule, requiring suppression of wiretap evidence that the government obtains in violation of Title III. 18 U.S.C. § 2515; *see United States v. Giordano*, 416 U.S. 505, 524–25 (1974).  "A different district court judge must decide any motion to suppress wiretap evidence, creating a second level of review in the district court." *United States v. Rodriguez*, 851 F.3d 931, 937 (9th Cir. 2017).  The reviewing district court judge "must review de novo whether the application for a wiretap contains a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous. [] If the wiretap application meets these requirements of 18 U.S.C. § 2518(1)(c), then the district court judge should review for 'abuse of discretion the issuing judge's conclusion that the wiretap was necessary.'" *Id.* at 938 (quoting *United States v. Rivera*, 527 F.3d 891, 898 (9th Cir. 2008)).  "In other words, the district court reviews de novo whether a full and complete statement of facts was submitted to the issuing judge under § 2518(1)(c), but 'review[s] the issuing court's ultimate decision to authorize a wiretap [under § 2518(3)(c) ] for an abuse of discretion.'" *Id*. (quoting *United States v. Gonzalez, Inc*., 412 F.3d 1102, 1111–12 (9th Cir. 2005)).

      "When deciding a motion to suppress evidence, the district court must examine each wiretap application separately and may look only to information in the relevant affidavit to determine whether it contains a full and complete statement of facts under § 2518(1)(c). [] 'Each wiretap application, standing alone, must satisfy the necessity requirement.' On that basis, the reviewing judge must decide first whether the statement of facts in each affidavit was sufficient under § 2518(1)(c), and then whether the issuing judge abused her discretion in finding necessity

4

and issuing the wiretap order." *Rodriguez*, 851 F.3d at 939 (quoting *United States v. Carneiro*, 861 F.2d 1171, 1176 (9th Cir. 1988)).

## II. *FRANKS* HEARING

A "defendant is entitled to an evidentiary hearing if he 'makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause.' To justify a hearing, a defendant must make specific allegations, allege a deliberate falsehood or reckless disregard for the truth, and accompany such a claim with a detailed offer of proof." *United States v. Craighead*, 539 F.3d 1073, 1080 (9th Cir. 2008) (quoting *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978)).

## DISCUSSION

## I. MATERIAL OR SIGNIFICANT MISSTATEMENTS OR OMISSIONS

Defendants identify several discrete areas in the Affidavits where the Special Agent allegedly made intentional or reckless misstatements regarding the past use or potential future use of other investigatory tools. They argue that these misstatements deprived Judge Chhabria and subsequently Judge Davila of a "full and accurate" description of the tools available for the investigation and of why the wiretaps were necessary despite those tools.

### A. Information About the Government's Ability to Track the Position of the Targets' Cell Phones

Defendants argue that Affidavit 1 materially misstated the government's ability to track the positions of targets through cell phone data to only within a range of "a few hundred meters to a couple thousand meters." They contend that the Agent relied upon that assertion to state that cell phone tracking data was insufficient: (i) to allow the government to identify the exact residence of Pizarro (one of the identified targets) within an apartment complex; (ii) to track the whereabouts of Reyes (another identified target), even when coupled with physical surveillance; and (iii) because that data would not provide "information about a user's state of mind or why a particular user was at [a] particular location at a particular time." *Compare* Mot. at 21 (quoting Affidavit 1 at 70) *with* Affidavit 1 ¶¶ 204-209 (detailing limits with cell phone tracking data).

1    Defendants argue that the statement that cell phone tracking can only show targets "within

2 a range of a few hundred meters to a couple thousand meters" was false because, in addition to

3 "ping" tracking data, the brief in support of the application submitted by counsel admitted that

4 "more precise" data location including E911 data and GPS tracking could be secured with search

5 warrants. *See* Dkt. No. 78-1 (Application for Wiretap 1) at 10 n.2.[3]  Defendants contend that after

6 Wiretap 1, the investigators in fact obtained further search warrants that successfully tracked the

7 targets' cellphones with more precise data monitoring.  Declaration of Audrey Barron, Ex. E [Dkt.

8 No. 78-4] (post-wiretap search warrant application for a "stash house" located through GPS

9 tracking).

10   Defendants rely on *United States v. Hamilton*, No. CR11-415-JCC, 2012 WL 5834886, at

11 *10 (W.D. Wash. Nov. 16, 2012).  There, the district court agreed that an agent's "downplaying"

12 of the utility of GPS vehicle trackers – despite the past, current, and future successful use of those

13 trackers in the investigation at issue – was recklessly inaccurate.  *Id*. at *11.[4]  They also rely on

14 *United States v. Carneiro*, 861 F.2d 1171, 1180 (9th Cir. 1988), where the court identified three

15 significant issues: (i) the agent's failure to "tell the issuing court that the DEA did not conduct a

16 traditional investigation of [defendant's] criminal activities before applying for the wiretap on his

---

[3] Application for Wiretap 1, pg. 10 fn. 2:

> In 2003, the FCC promulgated "E-911 Phase II" regulations, which imposed more stringent cellular telephone location requirements on wireless carriers. Carriers were allowed to choose from a variety of available technologies; some opted to use Global Positioning System ("GPS") technology in new customer handsets, while others opted for "multilateration" methods (often referred to as "triangulation") relying on signal measurements made from multiple towers. Unlike call-site information, which provides only the location of physical network infrastructure (cell tower) in the vicinity of the phone, "E-911 Phase II" or "precise location" information indicates the location of the phone itself.

[4] The court noted the agent "downplayed the utility of GPS tracking as an investigative tool" by asserting "GPS trackers only gave agents a starting point for physical surveillance," emphasizing "the risk of detection from installing additional trackers is too high," but subsequently conceding during the hearing on the motion to suppress "that trackers were used extensively throughout the investigation, and were helpful tools in an investigation like this one, where the goal and objective was to dismantle a criminal organization," and disclosing that during the pendency of the application the agents successfully deployed more trackers.  *Id*. at *9-10.

telephone line"; (ii) the agent used a copied version of facts from a prior, different affidavit; and (iii) the affidavit stated that "physical surveillance" of defendant's residence is "extremely difficult" but "fails to mention that the DEA never actually attempted to explore the possibility of physical surveillance until after the wiretap order was issued." *Id*. at 1180–81.

As an initial matter, defendants are not correct that – as in those two cases– it was only *after* the wiretap was secured that the government sought more traditional cell phone tracking data. The government disclosed in Affidavit 1 that it secured cell phone location data on three occasions prior to seeking Wiretap 1. Affidavit 1 ¶ 203; *see also* Declaration of Special Agent Hakeem Oduniyi (Dkt. No. 81-8), ¶¶ 14-20. In the Special Agent's declaration in support of the Opposition, the Agent explains that in each of those warrants the government sought both "ping" data ("GPS coordinates with a degree of uncertainty") and E-911 data (that "can provide a more specific and accurate location"). *Id*. ¶¶ 16-17. He describes how, in his experience, cell phone providers "do not typically provide" E-911 data and how, in this instance, *only* the more general ping data was returned as a result of the warrants served both before and contemporaneously with the granting of Wiretap 1. *Id*. ¶¶ 18, 21.[5]

In Reply, defendants argue that the government should have sought to enforce the warrants – forcing T-Mobile to provide the more precise E-911 sought – before seeking Wiretap 1. Defendants do not cite or identify any authority supporting that proposition. And in this case, the Special Agent fully disclosed that the government had sought cell phone tracking data in the first instance in Affidavit 1 and identified the weaknesses in the data that was produced. Unlike in *Hamilton* and *Carneiro*, there is nothing to suggest that the Special Agent mischaracterized the government's prior investigatory actions or the accuracy of the data it received from those warrants.

The Special Agent accurately detailed the prior and current use of cell phone tracking data

---

[5] At the hearing, defendants argued that it was "false" that E-911 data is not provided in response to warrants, identifying instances where E-911 data was produced as discovery to other defendants in other cases. But the Special Agent does not say that E-911 data is never produced, only that it is "typically" not produced in his experience and in this case T-Mobile did not produce the E-911 data. The defendants do not argue that those representations were false or misleading.

in *this* case. *See* Affidavit 1 ¶¶ 203-209. While he attested that the "range of the GPS location data points has ranged from a few hundred meters to a couple thousand meters," Affidavit 1 ¶ 204, he also clarified that "on certain occasions, the location data is accurate only to within several hundred meters, as has been the case here." *Id*. ¶ 209. Defendants do not argue that this statement was false or misleading. The Special Agent also explained why the tracking data the government had secured was not able to give it the full picture of how this specific conspiracy operated (in part because Reyes lives in Oakland but operated in the Tenderloin in San Francisco), who the unknown co-conspirators were, or where Pizzaro lived within an apartment complex; the Special Agent added that any cell phone data produced could not show or be used to establish "state of mind" evidence. *Id*. ¶¶ 203-209. That cell phone tracking data secured after Wiretap 1 was part of the evidence used to identify a stash house, presumably in conjunction with cell phone tracking data secured prior to Wiretap 1, does not make anything in Affidavit 1 false or misleading.

There was no intentional or reckless misstatement or omission regarding cellphone tracking data efforts or deficiencies.

### B. Information Regarding the Potential Effectiveness of Search Warrants for Historical Text Message Information and Call Detail Records

Defendants next argue that the Special Agent "implied" to the court that only Verizon kept historical text messages and so it would not have been helpful for the government to seek to obtain text messages from the targets' providers. Defendants contend that this implication was misleading because other carriers also preserve historical messages and the Agent's discounting of this tool before attempting to use it was misleading. Mot. at 25-26 (noting storage policies for Verizon, U.S. Cellular, Sprint, AT&T and iCloud). They recognize that in the Affidavit 1, both target numbers were T-Mobile accounts (and defendants provide no information regarding T-Mobile) but argue that given the preservation policies of other providers "the government likely could have seized historical text message information" for phones "in contact" with the two target numbers. *Id*. They also note that the returns and information discussed in Affidavit 2 indicated that a few identified members of the Reyes DTO used AT&T accounts or an iPhone. They contend that the "misleading" assertion regarding access to historical text data was "critical" to the

8

government's showing of necessity because the Special Agent had explained the Wiretaps were needed in addition to physical surveillance so that the government could determine the "nature, content, or scope of conversations" Reyes and Pizzaro had. Affidavit 1 ¶¶ 149-150.

In support of the Opposition, the Special Agent described why he believed at that time that Verizon was the only provider who maintained historical text messages and why others did not provide them. Oduniyi Decl. ¶¶ 23-24. He also explains why it would not have been useful to seek that information from AT&T (the one provider he knew a potential target used), why he believed both targets and their co-conspirators used Android phones, and how given the multiple sources of narcotics, securing the texts from one target would not have materially advanced the investigation. *Id*. ¶¶ 24-26.[6]

While incorrect, the Special Agent's misimpression about carriers retaining historical texts does not appear have been made intentionally or recklessly. But it does not undermine the necessary showing in any event. When the Affidavit is considered as a whole, the only possible target that returns show was using an AT&T phone at the time of the Affidavit 1 was Estafana Castenada. The Special Agent declares that he believed that Castenada communicated with Reyes only by voice call and not by text, so seeking historical text messages from AT&T would not have been fruitful. The Special Agent sought cell phone location data for Castenada and employed other good faith efforts in the investigation of the multi-member, multi-level conspiracy. Oduniyi Decl. ¶¶ 24-25. *See, e.g., United States v. Commito*, 918 F.2d 95, 98 (9th Cir. 1990) ("It is also worth noting that the existence of a potentially productive unused method is not fatal in this necessity determination, because '[a]n investigative agency is not required to exhaust all possible investigative techniques before resorting to a wiretap.'" (quoting *United States v. Martin*, 599 F.2d 880, 887 (9th Cir.1979)); *see also United States v. Reed*, 575 F.3d 900, 911 (9th Cir. 2009) ("T]he necessity requirement is directed to the objective of the investigation as a whole, and not to any particular person. If the Government can demonstrate that ordinary investigative techniques would not disclose information covering the scope of the drug trafficking enterprise under investigation,

---

[6] Defendants assert that warrant returns show defendants Cruz-Arteaga and Mancia also used AT&T phones, but the identity of those defendants were not known at the time of Affidavit 1.

then it has established necessity for the wiretap.").

I do not find that there was a reckless misstatement regarding other providers' retention of historical text data, but even if there was, that misstatement was not material to Affidavit 1 and would not have altered the necessity showing for Wiretap 1.

### C. Information About the Availability of Informants

Defendants claim that the Special Agent's statement that no informants were available to identify the activities of the targets was false because the same day Affidavit 1 was submitted, Task Force members met to discuss an informant on the Reyes DTO. But as the Special Agent explains, he was not aware of the informant at the time the Application was submitted or signed and did not learn of him until he spoke with a DEA agent and Task Force member on March 3rd or 4th. Oduniyi Decl. ¶ 36 (also noting that the DEA agent was not aware that the ATF's informant was connected to the Reyes DTO until after February 24, 2022). Significantly, in Affidavit 1 the Special Agent accurately explained why informants had not been identified at that point and why informants were unlikely to sufficiently advance the investigation. Affidavit 1, ¶¶ 128-136.

In Reply, defendants surmise that since the information was known to the San Francisco Police Department ("SFPD"), a partner in the Task Force with the DEA, at least three weeks before the Application for Wiretap 1 was submitted, and because the SFPD was using the informant make narcotics buys from a known member of the Reyes DTO prior to the submission of the Affidavit, the Special Agent could have and should have discovered and then addressed the existence of the informant in Application 1. *See* Def., Ex. H [Dkt. No. 78-6] (DEA report noting February 2, 2023 SFPD buy). But even considering the timing of the Task Force meeting discussing the informant (contemporaneous with Application 1), the failure of the Special Agent to check in with other Task Force members to uncover information unknown to him at that time does not amount to an intentional or reckless misstatement or omission that undermined necessity. Defendants speculate that the Special Agent could have and should have known of the DEA's informant's existence and connection to the Reyes DTO. But the Special Agent accurately explained why seeking out and attempting to use informants to uncover the conduct and scope of

10

drug trafficking enterprises is rarely successful and would not likely be successful in *this specific investigation,* which is more central to the necessity showing in Affidavit 1. Affidavit 1 ¶¶ 130-134. Importantly, defendants do not identify anything produced in discovery regarding the Task Force in general or the investigation into the Reyes DTO that demonstrates that the DEA informant or any other informant could have or would have been able to uncover the scope of the conspiracy here in order to secure evidence sufficient not only to uncover the identity individuals involved but also the scope of that involvement. *Decoud*, 456 F.3d at 1007 ("[t]he necessity for the wiretap is evaluated in light of the government's need not merely to collect some evidence, but to develop an effective case against those involved in the conspiracy") (internal quotation marks and citation omitted); *McGuire*, 307 F.3d at 1198 ("effective case" means "evidence of guilt beyond a reasonable doubt, not merely evidence sufficient to secure an indictment.").

### D. Information About the Agents' Potential Seizure of Cell Phones and the Usefulness of the Data Such Seizures Would Yield

Defendants contend that the Special Agent also made false or misleading statements regarding the past seizures and general utility of seizures of cellphones used by members of the Reyes DTO, omitting from the Affidavits the arrests and subsequent cell phone searches the Task Force conducted in October 2021, including the arrest and cell phone search of "Edin Ismael Rodriguez-Cartagena" who was subsequently identified as a target in Wiretap 2. Defendants specifically target the Special Agent's statement that search warrants on cellphones "will not yield fruitful information" on the Reyes DTO and that agents had not been able to seize the phones of others in the Reyes DTO. Mot. at 28-29; Affidavit 1 ¶¶ 259, 262.

The government points out that the first assertion was not actually made by the Special Agent. At most, the Agent stated that a search of a specific suspect (Melendez) would not yield fruitful information for the Reyes DTO. Affidavit 1 ¶ 259. Regarding the Agent's alleged failure to disclose in either Affidavit the Task Force's October 2021 arrests and search of cell phones of two individuals who were later included as targets in Wiretap 2, the Special Agent explains that while he was present when SFPD searched the home of Rodriguez-Cartagena and Mancia-Murillo in October 2021, he was "present to assist with the search of the home and was not directly

11

involved in the investigation." Oduniyi Decl. ¶ 32. At the time he submitted Affidavit 1 in February 2022, he did not know those two individuals were connected to the Reyes DTO and did not identify Mancia's connection to the Reyes DTO until he listened to the wiretaps. *Id*. ¶ 33. He also explains that he did not identify "Ismael" (as he was identified in Affidavit 2, without a known date of birth) as "Edin Ismael Rodriguez-Cartagena" or connect him to the DTO until he listened to the interceptions from Wiretap 2. *Id*. ¶¶ 34-35; *see also* Affidavit 2 ¶ 7(o) (listing only partial information regarding "Ismael"). Defendants point to no evidence in Task Force records that would undermine or call into question these explanations.

But even assuming that the Special Agent should have clearly linked "Ismael," a target in Wiretap 2, to the Edin Ismael Rodriguez-Cartagena arrested by the Task Force in October 2021, the failure to disclose that link in Affidavit 2 does not undermine the necessity showing. The question is whether the Agent's alleged failure to discuss those past arrests and cell phone searches could have diminished the necessity showing for the Wiretaps. The Special Agent explained in both Affidavits why arresting known DTO members at those junctures – allowing their cell phones to be searched – would not have been fruitful. Affidavit 1 ¶¶ 251-254; *see also United States v. Bennett*, 219 F.3d 1117, 1122 (9th Cir. 2000) (statute "'does not mandate the indiscriminate pursuit to the bitter end of every non-electronic device as to every telephone and principal in question to a point where the investigation becomes redundant or impractical or the subjects may be alerted and the entire investigation aborted by unreasonable insistence upon forlorn hope.' Thus, the mere attainment of some degree of success during law enforcement's use of traditional investigative methods does not alone serve to extinguish the need for a wiretap." (quoting *United States v. Baker*, 589 F.2d 1008, 1013 (9th Cir.1979)).

There was no intentional or reckless misstatement or omission regarding cell phone seizures. However, assuming there were misstatements or omissions, failure to disclose the past seizure and search of two phones of individuals eventually identified as involved in the DTO under investigation did not undermine necessity of Wiretap 2.

### E. Information About the Usefulness of Call Detail Records

Next, the defendants contend that the Special Agent omitted material information

regarding the utility of "call detail records" to the investigation. The government contends that discussion of "call detail records" was unnecessary and would have been duplicative because the Special Agent did discuss "toll records" that, according to the Special Agent, can be more valuable than mere call detail records. Oduniyi Decl. ¶¶ 27-3 (explaining the similarities and differences between toll records and call detail records). The government also argues that both of these types of records were not able to get the government proof beyond a reasonable doubt regarding the suppliers and distributors in the DTO under investigation. *See* Affidavit 1 ¶¶ 219-229.

In Reply, defendants assert that the government nonetheless should have been required to seek call detail records – that can produce more detail than toll records – through a search warrant before seeking the wiretap or in order to make a more detailed showing of necessity. Reply at 11. Defendants cite no authority in support. They also fail to acknowledge that even if more detailed call detail records had been sought and secured, a wiretap would still have been necessary considering the scope of the investigations being conducted by the Task Force, to secure evidence definitively identifying the suppliers and distributors in the DTO, and to gather state of mind evidence necessary to connect the different targets to their roles.

### F.     Boilerplate Remainder

Finally, defendants argue that after the misstatements or omissions are purged from the Affidavits, all that is left is "boilerplate" assertions regarding investigatory techniques and such boilerplate assertions are insufficient as a matter of law to show necessity for a wiretap. *See Blackmon*, 273 F.3d at 1210 (noting an affidavit containing "general allegations that would be true in most narcotics investigations" is insufficient, as is an affidavit containing "boilerplate conclusions that merely describe inherent limitations of normal investigative procedures").

Defendants are incorrect. If I omit the potential misstatements identified above – the provider retention of historical text messages, the identification of one potential DEA informant, and the past seizure and search of cell phones from two targets of Wiretap 2 – what remains are Affidavits that not only address the inherent limitations of normal investigatory tools and the deficiencies in the general context of "narcotics investigations" but also the facts of this specific investigation. Throughout the Affidavits, the Special Agent discusses what had been uncovered as

1    a result of the Task Force's efforts in general and the Special Agent's efforts regarding the Reyes

2    DTO in particular, and why despite the use of more traditional investigatory tools the Wiretaps

3    were necessary.

4    **II.     WHETHER NECESSITY NONETHELESS DEMONSTRATED**

5    Even assuming the defendants made a showing that the Special Agent made intentional or

6    reckless misstatements or omissions in his Affidavits, those misstatements or omissions do not

7    diminish the necessity showing for either of the Wiretaps. Considering each Affidavit separately,

8    and each in full, I find that the necessity for the wiretaps sought and received was established.

9    I agree with defendants that the government cannot use the fact that it was investigating a

10   drug trafficking conspiracy by itself to establish the necessity of a wiretap, and that a necessity

11   showing must be tailored to the known targets identified in the Applications and Affidavits. *See,*

12   *e.g., United States v. Carey*, 836 F.3d 1092, 1093–94 (9th Cir. 2016) (recognizing Wiretap Act

13   required the government to establish "of probable cause and necessity as to those specific speakers

14   targeted" by the Wiretap and not unknown or other members of the conspiracy more generally).

15   Here, the Special Agent created case and target-specific affidavits. He addressed all available

16   investigative sources, did not omit material information regarding tools that could produce or had

17   produced valuable evidence, or otherwise mislead the reviewing judges into thinking efforts had

18   been made that were not made. The Special Agent described why the Wiretaps were necessary

19   not to identify unknown participants in the conspiracy but to gather proof against the targets

20   regarding their role in and the scope of the conspiracy, so that proof beyond a reasonable doubt

21   regarding the targets could be secured.

22   In Reply, the defendants criticize the government for portraying to the reviewing judges

23   that their investigation concerned a "widespread" conspiracy yet the facts then-known to the

24   government and submitted for review by the issuing judges concerned only a "small-scale"

25   conspiracy. Reply at 5-6. But the defendants do not dispute that both Affidavits targeted specific

26   individuals that the Special Agent reasonably believed to be involved in the DTO. They point to

27   no evidence the government had that was withheld from the reviewing judges regarding the scope

28   or size of the conspiracy. That a smaller number of individuals were eventually arrested and/or

14

charged does not create a material misimpression that impacts the necessity finding.[7]

## III. ABUSE OF DISCRETION

I find that each Affidavit contained full and complete statements concerning whether or not other investigative procedures have been tried and failed or why those procedures reasonably appear to be unlikely to succeed if tried or were too dangerous. I also find that it was not an abuse of discretion for Judges Chhabria or Davila to approve the Wiretaps as necessary for the DTO investigation. *See Rodriguez*, 851 F.3d at 938 ("a reviewing district court judge must review de novo whether the application for a wiretap contains a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous" and if the wiretap application meets these requirements "then the district court judge should review for abuse of discretion the issuing judge's conclusion that the wiretap was necessary") (internal quotation omitted).

## IV. *FRANKS* HEARING

Defendants have failed to demonstrate that a *Franks* hearing is warranted. Assuming that the statements by the Special Agent were intentional or reckless misstatements or omissions regarding (1) provider retention of historical text messages, (2) the identification of one potential DEA informant, and (3) the past seizure and search of cell phones from two targets of Wiretap 2, given the discussion of those issues above, those alleged misstatements or omissions were not material to the finding of probable cause. Probable cause for both Wiretaps remained. *See United States v. Perkins*, 850 F.3d 1109, 1119 (9th Cir. 2017). *United States v. Craighead*, 539 F.3d 1073, 1080 (9th Cir. 2008) (defendant entitled to an evidentiary hearing only if they make "a substantial preliminary showing" that a "false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, *and if the allegedly false statement is necessary to the finding of probable cause*." (internal citations omitted, emphasis added).

---

[7] Nor is this a situation where the defendants argue that they were not operating within the conspiracy identified in Wiretaps. *See United States v. Carey*, 836 F.3d 1092, 1098 (9th Cir. 2016) (holding a wiretap order cannot not authorize the wiretap of "others yet unknown" participating in a conspiracy "yet unknown").

**CONCLUSION**

The motion is DENIED.

**IT IS SO ORDERED.**

Dated: October 12, 2023



William H. Orrick
United States District Judge